[Civ. No. 5752.   Third Appellate District.—June 16, 1937.]

E. L. WALLACE, Appellant, v. WILLIAM CRAWFORD
et al., Respondents.

A. G. Bailey for Appellant.

C. C. McDonald, Chickering & Gregory and Harry M. Creech for Respondents.

THOMPSON, J.—The plaintiff has appealed from a judgment which was rendered against him in a suit to recover an alleged balance of the purchase price due upon sale of his entire rice crop for the year 1934. The complaint is couched in six counts. The first count alleges that the defendant, William Crawford, is indebted to the plaintiff in the sum of $26,688.02, being the unpaid balance due upon an *agreed price* for the rice crop. The second count alleges that Craw-

ford is indebted to plaintiff in that amount as the *reasonable value* of the unpaid portion of the crop. The third count is based upon an alleged *stated account* for said balance of the purchase price of the crop. On motion these three counts were dismissed as to the defendant, Crocker First National Bank, for the reason that they did not purport to charge a cause of action against that corporation.

The fourth cause alleges that the defendant Crawford became indebted to plaintiff in the said sum of $26,688.02, as the unpaid balance due upon the rice crop of 1934 at the agreed purchase price and according to the reasonable value thereof, and that without right or authority therefor, Crawford delivered said sum of money to the Crocker First National Bank, which still holds possession thereof, and which sum, upon demand therefor, the bank refuses to pay to plaintiff. The fifth cause charges both defendants with becoming indebted to plaintiff in said sum for *money had and received* for his benefit. The sixth cause charges both defendants with receiving and converting said sum of money to their own use to the plaintiff's damage in that amount. Separate answers were filed by the defendants, denying the material allegations of the complaint.

The cause was tried by the court sitting without a jury. Findings were adopted unfavorable to the plaintiff upon all the material allegations of each count of his complaint. The court then affirmatively found that the plaintiff sold to the defendant, William Crawford, his entire rice crop of the year 1934 upon an express contract for the agreed sum of $35,726.07, which was fully paid, and that the defendants were not indebted to plaintiff for any sum whatever. Judgment was then rendered to the effect that plaintiff take nothing by his action. From that judgment the plaintiff has appealed.

The appellant concedes that he received from William Crawford the sum of $35,726.07, on account of the purchase price of his rice crop, but asserts that the agreed price and the reasonable market value of the crop of 1934 includes the further sum of $26,688.02, no part of which he received. It is contended the findings are not supported by the evidence.

On the contrary the respondents assert that the plaintiff's rice crop was purchased by William Crawford, who was the owner of the Woodland Rice Milling Company, by means of

an express contract on the same terms and for the agreed price established by written agreements between other rice growers and the millers of California pursuant to the plan outlined in the Agricultural Adjustment Act which was adopted by Congress in 1933. This act was subsequently declared unconstitutional by the Supreme Court of the United States. (*United States* v. *Butler*, 297 U. S. 1 [56 Sup. Ct. 312, 80 L. Ed. 477, 102 A. L. R. 914].) The fate of the Butler case, however, does not affect the result of the present action. The Agricultural Adjustment Act was intended to curtail the annual aggregate production of certain farm crops on the theory that excess quantities thereof had been previously produced and marketed. The purpose was to create "fair exchange values" of the specified crops based upon ascertained previous average production and prices thereof according to recommended agreements between the farmers and the millers or processors and to deduct from the base price thus secured an estimated percentage or sum to be paid by the purchasers or millers into a trust fund from which the contracting farmers were to be compensated for the assumed loss sustained by reason of a reduction of the number of acres formerly planted by them. This was termed a processing tax which was to be paid by the millers. The plaintiff in this case was not a party to a similar contract pursuant to the Agricultural Adjustment Act. He is what has been termed an independent grower. It is merely claimed his agreement to sell this crop of rice was upon the same terms as those contracts which other growers of rice executed with the millers of California.

The respondents also claim that since the plaintiff was paid for his rice by means of checks, the last one of which contained the following condition: "Endorsement of this check constitutes payment of the items listed below. Acct 1934 Rice Crop, *Payment in Full* as per ledger acct," that the cashing of these checks constitutes an account stated which estops him from asserting any further claim on that account.

The chief issue in this case, as stated by the appellant, is, who owns the 40 per cent trust fund deducted from the estimated base price of the rice crop, which is conceded to amount to $26,688.02. The issues as stated by the respondents, are: (1) What was the contract price of the rice?

(2) If the minds of the parties did not unite upon a contract, what was the reasonable market value of the crop? and (3) Did the plaintiff estop himself from making an additional claim by reason of cashing the checks which he received endorsed as "payment in full"?

We are of the opinion the findings and judgment are supported by the evidence. The record does show that the plaintiff was an independent grower of rice who had not signed a contract with the millers or purchasers of California, but that he did sell and deliver to William Crawford, the owner of the Woodland Rice Milling Company, his entire crop of 1934; that his attention was called to and he was entirely familiar with the plan upon which most of the rice growers of California had previously contracted with the millers pursuant to the federal Agricultural Adjustment Act to curtail the acreage and subsidize the farmers for the purpose of reducing the aggregate quantity of rice produced by ascertaining an average "fair exchange value" of the commodity including an estimated percentage of the exchange value or selling price to be paid into a trust fund by the millers, processors or purchasers thereof for the purpose of compensating those contracting farmers for the loss presumed to have been sustained on account of reducing the usual number of acres formerly planted by them. The plaintiff was furnished statements with each delivery of rice clearly setting out this plan including the fixed item of 40 per cent of the "base price" to be paid by the miller into the trust fund for the purpose heretofore mentioned. A copy of one such statement follows as an illustration of the contents. The net "purchaser's price" allowed to the producer varies slightly in these statements, but the average amount is from $1.07 to $1.09 per hundred weight. That statement reads:

"CALIFORNIA RICE INDUSTRY
APPRAISAL CERTIFICATE and PADDY PRICE DETERMINATION FORM

Date October 29, 1934                     Certificate No. 523
Stored in name of E. L. Wallace   Bags abt. 1300   Shipping Point Woodland   Warehouse Woodland Rice Mill   Lot No. 203   EXTRA FANCY HEAD 50 BROKENS 19 BY–PRODUCTS 11   TOTAL 80   Moisture ....%   Red ....

in 50 Grams Mud....%  Cereal Grains....in 500 Grams
Wt. Per Bushel....lbs.  Chalk....%  Seeds....%  Seed
Matter....%

REMARKS:      BAGS:      NEW      ~~USED~~

This appraisal represents the best judgment of the under-
signed appraisers as to the milling yield of this lot based on
sample submitted.

F. RICHWOOD      G. E. GLANNEN      M. E. MILLER
Official Appraiser      Official Appraiser      Official Appraiser

---

## PADDY PRICE DETERMINATION FORM

For Deductions and Trust Fund Computation, respectively, see
Article V, Section 3, Schedule D and Article IX, Section 6 (a) of
the Marketing Agreement.

| | Column No. 1 | Column No. 2 | Column No. 3 | Column No. 4 |
|---|---|---|---|---|
| | Appraised Milling Yield | Base Price | To Compute Producers Price | To Compute Trust Fund Payment |
| Extra Fancy Head | 50 Per Cent | 3.78 | 1.8900 | (48) |
| Brokens | 19 Per Cent | 2.125 | .4037 | (21) |
| By-Products | 11 Per Cent | 18. | .0990 | (11) |
| Totals | 80 | | 2.3927 | (80) |

| | | |
|---|---|---|
| Deductions: | | |
| (a) Freight to San Francisco................ | .1057 | |
| (b) Drayage (.04 per 100 pounds milled product) ............................ | .0320 | .0320 |
| (c) Cash Discount (1% of milled product gross proceeds) ......................... | .0239 | |
| (d) Brokerage (.08 per 100 pounds milled product) ............................ | .0640 | .0640 |
| (e) Bag Allowance (.09 if used bags, otherwise .07) ........................... | .0700 | |
| (f) Milling Charge (.30 per 100 pounds paddy) | .3000 | .3000 |
| (g) Marketing Assessment (if any levied).... | .... | |
| (h) Appraisal Charge (.005 per 100 pounds paddy) ............................. | .0050 | .0050 |
| (i) Handling Charge ..................... | .0717 | |
| Total Deductions | .6723 | |
| Producers Price (flat) | 1.7204 | (40% of Above Item) |
| Price Differential: (Not more nor less than 3% of Producers Price)   3% | .0516 | |
| Producers Price (if differenced) | 1.7720 | |
| Less Payment due Producers' Trust Fund (last item Column No. 4) | .6754 | |
| Purchase Price | 1.0966 | |

All Calculations Must Be Carried to Four Places (No More Nor Less)
Beyond Decimal Point"

There is a conflict of evidence with regard to the question as to whether the plaintiff's crop was sold upon the exact terms of the contracts which the millers held with other rice growers as indicated by the preceding statement. The plaintiff testified in that regard:

"This [$26,688.02] represents the money that was withheld for the forty per cent. . . . When Mr. Crawford bought that rice he told me that forty per cent of it would be withheld and paid into the bank, or the crop board. . . . Mr. Crawford paid me sixty per cent when he bought the rice. . . . I agreed to sell the rice to Mr. Crawford. . . . He stated to me what the price of the rice would be. Q. He told you that he would buy your rice upon the basis of the appraisal schedules which had been issued by the Crop Control Board—you had a copy of them and he had a copy of them, did he not? A. Yes, I had a copy of them, and so did he. . . . Well, Mr. Crawford told me, when he bought this rice, that all that he could pay would be sixty per cent of the value of the rice. . . . I told Mr. Crawford that I objected to it, that I intended to sue for the forty per cent. Q. Well, you knew that was all he could pay you for the rice? A. I knew that was the only way I could sell my rice. . . . Q. That is the last figure in column 3 (of the preceding statement) that shows you what Mr. Crawford told you that he could pay for the rice as far as he was concerned, isn't that a fact? A. Yes, that is what he said."

In response to a question addressed to Mr. Crawford on cross-examination, he did say that he believed the plaintiff "did object to paying any money to the producers trust fund". But he also testified regarding the purchase of the rice:

"I explained to the best of my ability the working of the rice agreement and explained to Mr. Wallace the maximum price which I could pay for the rice. . . . I explained the deductions . . . of the amount fixed for payment to the trust fund. . . . We had figured the base of the market for this particular lot of rice and that I had returned Mr. Wallace the full market value including the three per cent up for all rice we purchased. . . . Q. And you showed those [appraisal certificates] to him, didn't you? A. Yes. . . . Q. And the last item in column No. 3 there, what does that represent? A. It represents the full market value of that lot of rice at that time. . . . Q. And is that the price that

you agreed to pay Mr. Wallace for rice? A. Yes, it is. . . . That [indicating a statement exhibited to him] is a statement of account with Mr. Wallace, showing the actual moneys due Mr. Wallace for the full market value of all lots of rice which I purchased. Q. And did you settle with Mr. Wallace upon the basis of that statement? A. Yes sir, I did. . . . Q. He accepted that in full payment? A. Yes sir.''

Regarding the market value of rice, Mr. George W. Brewer of .Sacramento, manager of the Rice Growers' Association, testified:

''Q. What was the market value of rice, to the grower, between that interval of time? A. About ninety-five cents. Between ninety-five cents and a dollar for average grade. . . . Q. That was after deducting the forty per cent that was to be transmitted to the rice control board, was it not? A. There wasn't any forty per cent deducted from rice that came from the farmer. . . . All deductions were made from the processed article. . . . The price paid to the independent, for the purchase price of his rice, was the same, regardless of whether he was in the control or whether he was not. In other words, the market price at that time was around ninety-five cents to one dollar. . . . Q. This forty per cent . . . hasn't anything to do with the market value of rice to the grower, has it? A. No sir, nothing whatever. Q. When he says that forty per cent was taken from the independents, is that a correct statement? A. That is not so. Q. This forty per cent . . . *was paid by the mills* to the trust fund? A. That is right.''

By reference to the last figures in column three of the preceding ''Appraisal Certificate'' to which the witnesses referred, it will be observed that the ''Purchase Price'' of the rice is given as $1.0966 per hundredweight. At the head of that same column appears the statement ''To Compute *Producers Price*''. It seems quite clear that the plaintiff could not have been misled into believing that the forty per cent item which was paid by the purchaser or the miller into the trust fund was included as a part of the market price which he was to receive for his crop of rice. Clearly, the trust fund item is to be excluded in ascertaining the producer's selling price. There appears to be substantial proof to support the findings of the court to the effect that the crop was sold upon an express contract for an average price of approximately $1.07 to $1.09 per hundredweight;

that the base price was a fictitious valuation and not the market value of rice to the producer; that this base price included freight, drayage, milling charges, processing charges to be paid by the miller into the trust fund and other items; that the forty per cent trust fund item was not deducted from the producer's selling price, but, on the contrary, it was called and deemed to be a process tax charged to the miller who purchased and handled the grain, pursuant to the terms of the Agricultural Adjustment Act, and that the appellant therefore had no interest in or claim upon any portion of that particular trust fund item. At least, in support of the judgment, the contract is reasonably susceptible of that construction. The appellant having conceded that he was fully paid the entire purchase price of his crop of rice, with the exception of that disputed trust fund item, it follows that he was not entitled to recover any further sum from the respondents.

■ Assuming, without so deciding, that the minds of the parties did not meet with respect to the agreed price to be paid for the rice, and that the contract failed on that account, then the appellant was entitled to recover only upon a *quantum meruit* the reasonable market value of his crop. Upon that issue it appears that he was actually paid more than the market value of his rice, and that he was therefore not entitled to judgment for a further sum of money on that theory of the case. Mr. Brewer, the manager of the California Rice Growers' Association, testified that the full market value of rice during the season in question was from ninety-five cents to one dollar per hundredweight. There is no other direct evidence on that subject. It is conceded the appellant received from $1.07 to $1.09 per hundredweight for his rice crop. The court therefore properly found that the appellant was fully paid for his crop, and that the respondents are not indebted to him in any further sum on that account.

■ The court did not specifically find that the market value of the rice was actually less than the price which the appellant received. But the court did find that the respondents are not indebted to the appellant for any unpaid portion of the "reasonable value" of his crop of rice. More specific findings in that regard would necessarily be adverse to the appellant. The judgment is therefore adequately supported.

In view of our previous conclusions that the appellant

is not entitled to recover a judgment in this action either upon a construction of the contract of the sale of his rice crop or on the theory of a *quantum meruit,* it becomes unnecessary for us to further determine whether the conduct of the parties as shown by the record constitutes an accord and satisfaction which precludes the appellant from asserting a further claim after accepting and cashing his final check for the sum of $18,233 upon which instrument there was written: ''Endorsement of this check constitutes payment of the items listed below. Acct 1934 Rice Crop, *Payment in Full* as per ledger acct.'' For the same reason it is not necessary for us to further determine whether, under the circumstances of this case, the appellant could lawfully maintain this action against the respondent, Crocker First National Bank of San Francisco.

The respondents claim that the acceptance and cashing of the final check which was endorsed ''Payment in Full'', under the circumstances of this case constitutes a stated account which precludes the subsequent questioning of any of the items thereof and that the cashing of that check, under the circumstances, also constitutes an accord and satisfaction which estops the appellant from asserting that he has not been paid in full for his entire claim. The court failed to adopt findings either upon the question of a stated account or with relation to an accord and satisfaction. In fact, neither of these defenses was specifically pleaded. However, the failure to plead these defenses does not necessarily prevent the respondents from relying upon them. It appears that evidence was adduced at the trial upon those issues without objection on the part of the appellant. He thereby waived his right to object to such defenses on appeal. (*Reed* v. *Cornell,* 54 Cal. App. 179 [201 Pac. 608]; *Bowman* v. *Payne,* 55 Cal. App. 789, 794 [204 Pac. 406]; *Tuffree* v. *Polhemus,* 108 Cal. 670, 676 [41 Pac. 806]; 1 Ency. of Pl. and Pr. 172, subd. II, 3.)

It is the general rule that the defense of accord and satisfaction must be pleaded. But where the complaint is based on a common count, as it was in this case, the defendants may urge any defense which tends to show that the plaintiff has not a subsisting cause of action. (*Heaton-Hobson etc. Offices* v. *Arper,* 145 Cal. 282 [78 Pac. 721]; *Meredith* v. *Santa Clara Min. Assn.,* 56 Cal. 178; *Wetmore* v. *San Francisco,* 44 Cal. 294, 300.) And where the complaint

affirmatively alleges a payment on account of the claim sued upon, the payment may be shown to constitute an accord and satisfaction without specially pleading that defense. (*B. & W. Engineering Co.* v. *Beam*, 23 Cal. App. 164, 176 [137 Pac. 624]; *Russell* v. *Riley & Peterson*, 82 Cal. App. 728, 737 [256 Pac. 557].)

It does appear that the appellant testified regarding the final payment to him:

"Q. So far as your dealings with Mr. Crawford were concerned, that check that I just showed you constituted the final payment of what Mr. Crawford owed you, isn't that a fact, Mr. Wallace? A. It did, yes sir."

While it is true that the appellant did cash the check with full knowledge of the contents of the appraisal certificate, with possession of information conveyed to him by Mr. Crawford that he considered the checks payment in full of the entire agreed purchase price of the rice crop, and realizing that the last check clearly stated on its face that the endorsement and cashing of that instrument would constitute "full payment" of the entire rice crop of 1934 "as per ledger acct.", yet the appellant did protest at the time he sold his rice crop in the fall of 1934 against the payment by Crawford of the forty per cent item into the trust fund. He then declared that he intended to sue for that amount, and this suit was commenced two months after the final check was cashed. These circumstances may raise the question as to whether the parties really intended the transaction relating to the delivery of the final check to constitute an accord and satisfaction.

It has been held that the question of the existence of an accord and satisfaction depends upon the intention of the parties which must be determined from the surrounding circumstances. (*Everhardy* v. *Union Finance Co.*, 115 Cal. App. 460, 466 [1 Pac. (2d) 1024]; 1 Cal. Jur. 136, sec. 12.)

It is a general rule of law that the acceptance of payment of a balance shown to be due on an account rendered by a debtor to his creditor ordinarily constitutes an account stated as against the party accepting the payment which precludes the creditor from thereafter questioning the accuracy of the account. (*Hansen* v. *Fresno Jersey Farm Dairy Co.*, 220 Cal. 402 [31 Pac. (2d) 359]; 1 C. J. 689, sec. 270.)

The question as to whether the acceptance and cashing a check by a creditor in payment of an indebtedness

due to him amounts to an accord and satisfaction depends upon the circumstances surrounding the transaction, taking into consideration the conduct and declarations of the respective parties with relation thereto. (*Sierra & San Francisco Power Co.* v. *Universal Elec. & Gas Co.*, 197 Cal. 376 [241 Pac. 76]; *Work* v. *Associated Almond Growers of Paso Robles,* 102 Cal. App. 232, 236 [282 Pac. 965]; 23 R. C. L. 1445, sec. 269; 1 C. J. S., p. 502, sec. 29.) In 1 Corpus Juris Secundum, page 511, section 31c, it is said:

"In determining whether a check tendered and accepted was intended as an accord and satisfaction may depend on the conduct and statements of the parties, *including notations or words upon the instrument itself.*"

While the endorsement on a check that the cashing of the instrument will constitute "full payment" of the indebtedness upon which it is applied may not necessarily be conclusive of an account stated, it is persuasive evidence thereof. In 1 California Jurisprudence, page 134, section 10, it is said:

"The great weight of authority in American courts undoubtedly supports the rule that where the amount due is in dispute and a check for an amount less than that claimed is sent to the creditor with a statement that it is sent in full satisfaction of the claim, and the tender is accomplished by such acts or declarations as amount to a condition that if the check is accepted at all it is accepted in full satisfaction of the disputed claim, and the creditor so understands, its acceptance by the creditor constitutes an accord and satisfaction, even though the creditor states at the time that the amount tendered is not accepted in full satisfaction."

Since the court failed to adopt findings regarding the question of a stated account and with respect to the doctrine of accord and satisfaction, we shall not attempt to determine whether the conduct of the parties under all the circumstances of this case determines this action adversely to the appellant on those issues. We are of the opinion it is unnecessary to do so.

The judgment is affirmed.

Plummer, J., and Pullen, P. J., concurred.