## CARR v. GOODYEAR TIRE & RUBBER CO., Inc.

### No. 4308–H.

District Court, S. D. California, Central Division.

Dec. 27, 1945.

Kemmel, an employee of defendant, and upon the exhibits attached to such depositions.

The complaint consists of three counts. The first sets forth a cause of action to recover an alleged balance due on commissions, claimed to have been earned under the terms of a certain agreement entered into between plaintiff and defendant under date of August 3, 1942, a copy of which is attached to said complaint and marked Exhibit A, also a certain supplemental agreement confirmed in writing under date of September 19, 1942, a copy of which is set forth in Paragraph III of said pleading, and a further written agreement entered into under date of April 1, 1943, said latter instrument expressly superseding all prior contracts between the parties.

The second count is in the nature of an action upon a common count for work and labor, etc., performed and for commissions earned by plaintiff upon sales made by him on behalf of defendant on account of which it is alleged defendant became and still is indebted to him.

The third count is also in the nature of an action upon a common count, alleging defendant is indebted to plaintiff in the sum of $8,079.70 as the balance of an account for commissions earned on the sale for defendant of articles sold by it and for services performed by him, all at its request, between August 3, 1942 and September 24, 1943, and that the aggregate amount of said indebtedness originally was the sum of $9,761.70, of which only $1,682 is alleged to have been paid.

In the first count, so far as pertinent here, it is alleged that during the period embraced by the aforementioned agreements and pursuant to the terms thereof, plaintiff sold to Pacific Naval Air Base, hereinafter called P. N. A. B., on behalf of defendant, merchandise having a total value of $130,155.99, also that all of said sales were normal sales and that he earned thereon commissions totalling $9,761.70, upon which only the sum of $1,682 has been paid, and that defendant is indebted to him for the balance amounting to $8,079.70.

As appears from the first count all of the aforementioned agreements pertained to the selling of defendant's products at a certain store located in Ventura, California whereat plaintiff was carrying on business. The principal features of the agreement of August 3, 1942, were as follows:

William T. Selby and Don R. Holt, both of Ventura, Cal., for plaintiff.

O'Melveny & Myers and John Whyte, all of Los Angeles, Cal., for defendant.

HOLLZER, District Judge.

This matter comes before the court on defendant's motion for a summary judgment. Said motion is based upon the pleadings, the exhibits attached thereto, the depositions of plaintiff and one William

1. Plaintiff agreed to allow defendant to use certain floor space at said Ventura store for the operation of an automobile tire and accessory store.

2. Defendant agreed to maintain a stock of merchandise at said store and to provide and compensate one of its employees to operate the same, it being understood that defendant should have the exclusive right to sell its merchandise in said store.

3. Plaintiff was authorized to sell said merchandise for defendant's benefit during such times as its employee should be absent from the store.

4. The sole compensation to be paid plaintiff for the space services and facilities furnished by him was to be an amount equal to 90% of the annual net profit of the store, determination of the net profit or loss to be in accordance with defendant's regular accounting practice.

5. Plaintiff agreed to apply or install and service all products sold through said store, also to furnish defendant the use of a truck and service man for repossessing merchandise sold, and to furnish telephone light, heat, and the use of equipment and facilities at his place of business without expense to it.

6. The term of said original agreement was to commence August 3, 1942 and end August 3, 1943, unless sooner terminated by either party at any time by five days written notice to the other.

The confirmation of the supplemental agreement was in the form of a written memorandum dated September 19, 1942 signed by defendant's District Manager, addressed to its Department Manager at Ventura and stating in part as follows:

"We have received approval to pay the Ventura store a 7½% commission on deliveries to P. N. A. B. at Hueneme. I want it understood that this 7½% commission applies to what we would consider normal deliveries—and this is no guarantee that we will allow 7½% on every delivery. What I have in mind is that this being an embarcation point there is always a possibility that for emergency reasons we may have to effect some abnormal deliveries through this point and on which it would not be good business to pass this commission."

The provisions of the last of these agreements were essentially the same as the contract of August 3, 1942, save that plaintiff's compensation was reduced from 90% to 85.5% of the annual net profit of the Ventura store, and except further that it was to be effective for a term of five years, subject to the right of either party to terminate the same upon written notice of not less than thirty days.

By its answer defendant admits the making of the several contracts above mentioned, save in certain minor particulars which are unimportant here. In said pleading defendant alleges it sold between September 1, 1942 and April 1, 1943 to P. N. A. B. at Port Hueneme merchandise having a total value of $136,879.08, also that all deliveries thereof were made by defendant from its Los Angeles and Akron, Ohio, offices, that of said merchandise only a portion thereof having a value of $41,095.33 constituted normal deliveries and was so considered by it, and that it has paid to plaintiff the full amount of the commissions thereon to which he became entitled.

In addition defendant alleges that between April 1, 1943 and October 1, 1943 it sold to the U. S. Navy Department at Port Hueneme merchandise having a total value of $65,262.74, also that all deliveries thereof were made by it from the above mentioned offices with the exception of tires and tubes valued at $20.22, that of said entire merchandise only a portion thereof having a value of $23,292 constituted normal deliveries and was so considered by it, and that it has paid to plaintiff the full amount of the commissions thereon to which he became entitled.

Besides denying any indebtedness to plaintiff, defendant has pleaded certain special defenses. The first of such defenses is in substance that defendant paid to plaintiff, and he accepted in full payment, satisfaction and discharge of its obligations to him under the several agreements aforementioned, the sum of $9,584.83, and that the same was paid by checks and vouchers delivered to him as per copies thereof attached to defendant's answer, and marked Exhibits A, B, C, D, E, F and G, respectively.

By its next defense defendant alleges that about April 22, 1944 it offered plaintiff a check with voucher attached in the sum of $1,360.85 upon condition that the same be accepted by him in final settlement of his share of profit resulting from the operation of its Ventura store, and that with knowledge of said condition he accepted said offer in writing, cashed said check and has never made any objection respecting the

same prior to the commencement of this action. Copies of the check and voucher referred to are attached to the answer as Exhibit "G" thereof. In this connection it is further pleaded that said written agreement of plaintiff to accept said money and the payment by defendant to him of said amount constituted an accord and satisfaction and final discharge of all claims on his part against defendant arising out of the operation of said Ventura store.

As a further defense it is alleged that the acceptance by plaintiff of the check and voucher aforementioned and the acceptance by plaintiff of said payment of $1360.85 constituted a full release and an extinguishment of all obligations of defendant in favor of plaintiff arising out of the operation of the Ventura store.

By way of still another defense it is alleged that plaintiff is estopped to claim he accepted the aforementioned check and voucher from defendant other than as a final settlement of his share of profit resulting from the operation of the Ventura store, in this that he accepted said check and voucher with knowledge of the conditions imposed therein, cashed said check and specified no objection thereto until the commencement of this action.

As a final defense it is alleged that the supplemental agreement of September 19, 1942 is void for uncertainty in that its terms, particularly defendant's offer to pay a commission on what it would consider normal deliveries to P. N. A. B. at Hueneme, were so vaguely expressed as to have no definite meaning, and in fact the same were differently understood by plaintiff and defendant.

In the course of his deposition plaintiff testified, so far as pertinent here, that a few days prior to November 20, 1942, defendant's District Manager, William A. Kemmel, delivered to plaintiff a profit and loss statement and the two men discussed the same. Referring to the latter conversation plaintiff testified as follows (Plaintiff's deposition, pages 23 and 24):

"Q. And what did Mr. Kemmel say to you at that time, approximately? A. Kemmel brought up that statement, that profit and loss statement, and when I went over it that day at the Goodyear store, I noticed that he hadn't paid me for the volume of business that had been going through P. N. A. B., Hueneme, and I asked him why and at that time he told me that he couldn't pay me for all that business, couldn't pay me seven and one-half per cent on all the business that went through Hueneme.

"Q. Did he give any reason? A. None, other than—no, I have forgotten now, but I just says—'Well', I says, 'In other words, you are going to pay me just what you want to', and he says 'Yes'. So I never discussed it any further with him. * * * "

Thereafter, under date of November 20, 1942, plaintiff sent the following communication to Mr. Kemmel (Plaintiff's deposition Exhibit 1):

"November 20, 1942.

"Wm. A. Kemmel
"1415 E. Olympic
"Los Angeles, Calif.

"You were very kind to bring up my P & L sheet for Oct. which was O K as far as it was explained to me, except the part you told me about the Company refusing to pay full delivery commission on Hueneme business. After you left I checked it over with my records and was amazed to find that the company had allowed only an approximate commission of 1% on Sept. and Oct. business to P. N. A. B.

"My records show, and you will recall that I mentioned to you I should have due me a commission on approximately $76,000.00 worth of deliveries. These sales were made to P. N. A. B. during Sept. and Oct., and you mentioned that the Company may refuse to pay this commission due on these large sales. It is hard to understand how this is the case when settlements are going thru on smaller sales to the same Company; as I interpret my contract and correspondence I am allowed certain commission on sales; for nothing has arisen to indicate that the terms of the contract have been altered by the Company in any manner whatsoever.

* * * * *

"Your Company has agreed that I am to receive a commission of 7½% on 'deliveries to P. N. A. B., at Hueneme.' My understanding is that this applies to all normal deliveries except that if the company should be required to deliver thru this point some abnormal deliveries, that no commission would be paid on such deliveries developed by them thru some abnormal effort in sales thru points other than the Ventura Store. No efforts were made by anyone from your office or from other offices of the Company in developing

business thru P. N. A. B. No abnormal efforts were required beyond those that were put into effect by my own organization, other than ordinary assistance you have always given in similar circumstances.

"Hueneme business originating at the point thru any contractors operating from there certainly would be considered as normal business and it seems to me that under my contract I am required to care for this type of business. Past experience indicates that a lot of time and energy is required to develop the necessary contacts and experience to complete sales to these contractors. Your help at times is very necessary to close these deals. 

"In conclusion I can only say that to me it appears that under the circumstances I am justly entitled to any and all commissions due so long as I perform under the terms of the Company contract except that they will insist that I live up to the terms and conditions as expressed therein and at the same time I am sure any interpretation by any competent authority will require that the Company do likewise.

"Will the company or you as tis agent write me definitely refusing to pay this commission, so I will know what course to take.

"Sincerely,
"(Signed) Ed J. Carr
"Ed Carr"

A few days after the last mentioned letter was sent Mr. Kemmel had another conversation with plaintiff. Concerning this conversation plaintiff testified as follows (Plaintiff's deposition, pages 28 and 29):

"Q. What was the substance of your conversation at that time? A. Well, he told me that he was afraid that he wouldn't be able to put it over with the company to pay me that money, that they probably would turn it down. But I told him it was the deal, I couldn't see why, that after all the store there at Ventura had developed the business.

"Q. Did Mr. Kemmel threaten to rescind the approval to pay the store a seven and one-half percent commission on normal deliveries to P. N. A. B.? A. No, but he told me that—part of the conversation as I remember was that we had made money at the store even if we hadn't sold P. N. A. B. anything the store still made some money. Kemmel pointed out to me, he says, 'Now, if you go ahead and sue us', he says, 'Maybe you can even collect. But,' he says,

'We will have to immediately cancel your contract and if you think you can collect, why' he says, 'You can probably collect all right. But if you do, we will have to cancel your contract. It might cost you more money in the long run than if you developed the P. N. A. B. business.'

"Q. Did you threaten to sue Goodyear when you talked to Mr. Kemmel? A. I told him that—well, yes, I did. I told him that I wanted to get paid. I felt that I should be paid and if they wouldn't, why I would do something about it. That was the course of the conversation. Of course, there was more to it than that, but that was the principle part of it."

Plaintiff and Kemmel were together every sixty days or so, and on each of these occasions they talked about the P. N. A. B. business. Referring to these discussions, plaintiff testified as follows (Plaintiff's deposition, pages 30 and 31):

"Q. And what was the substance of your conversation on those occasions? A. Oh, I just always asked him why—when he was going to pay it.

"Q. Pay what? A. Pay me that seven and one-half percent that he owed me.

"Q. Do you understand that the seven and one-half percent commission was to be paid directly to you? A. To the store, of which I would receive ninety.

"Q. And what did Mr. Kemmel say in return to reply to your question? A. That he wouldn't be able to do any good with the company, as I said.

"Q. Was he allowing a commission of seven and one-half percent on certain deliveries during that period? A. Yes.

"Q. The store was then receiving a seven and one-half percent commission on certain deliveries made to P. N. A. B.? A. Right.

"Q. And you were not satisfied with the amount of commission that was being allowed? A. I wasn't satisfied, that's right. I either wanted—I wanted something definite. In other words, if I was to receive seven and one-half percent, I should receive seven and one-half percent on the whole thing that we were handling."

In addition, plaintiff testified that he talked to defendant's manager of the Ventura store, a Mr. Bruce Brown, about the amount of the commission to be paid to said store. Respecting his conversation with Brown, plaintiff testified that at dif-

ferent times he expressed to Brown his dissatisfaction regarding the amount of commission that was being paid to the store. In response to the question:

"Did you ever tell Bruce Brown that you were going to sue Goodyear?" he answered, "I imagine that I did, from time to time, more probably—more than one time —told him that they should pay me and if they didn't, I would sue them because I had it coming." (Plaintiff's deposition p. 35.)

Under date of August 16, 1943 plaintiff gave defendant written notice of termination of the then existing agreement governing the operation of the Ventura store, and about September 30, 1943 plaintiff was checked out. (Plaintiff's deposition p. 43 and Exhibit 2.)

Under date of December 28, 1943, defendant sent to plaintiff its check No. 88990 in the sum of $1,500, together with its voucher of the same date and bearing the same number. Said voucher contained a statement reading in part as follows: "Partial settlement of your share of profit resulting from operation of store No. 8377."

Plaintiff admits receipt of the aforementioned check and voucher and also cashing the check shortly after the date thereof. (Plaintiff's deposition, p. 49.)

On April 19, 1944, plaintiff sent to defendant a letter in the course of which he wrote in part as follows: "Last September 30 I sold out as dealer for your 'D' store No. 8377 in Ventura. * * * Your company still owes me a considerable sum of money * * *. Please notify me when you will send the check." (Plaintiff's deposition, p. 49, and Exhibit 4.)

Thereafter defendant sent plaintiff its check No. 95934 bearing date April 21, 1944 in the amount of $1,360.85. This check was accompanied by a voucher of the same date and number, together with a statement containing certain computations and purporting to show a balance payable to plaintiff in the amount last mentioned. Referring to the latter transaction plaintiff testified as follows (Plaintiff's deposition, pages 49 to 52):

"Q. Now, I show you a photostatic copy of a check and voucher dated April 21, 1944 in the sum of $1,360.85, check No. 95934 and ask you if you received that check and voucher and attached statement on or shortly after April 21, 1944? A. Well, I obviously received the check. I don't remember this.

"Q. You don't remember the statement showing break-down of figures? A. Beall made that up, huh?

"Q. Do you remember receiving the voucher? A. Yes.

"Q. Were the voucher and check attached to each other as they are now? A. Probably were.

"Q. Were they pinned on on the upper left hand corner as they are here? A. Well, I sure can't remember that, but I obviously received that check and that voucher. Probably they always or usually came together.

"Q. Had you ever agreed with Goodyear before you received this check that $1,360.-85 was the final amount due you? A. Well, I never agreed with them. I always figured they owed me more.

"Q. There had been no discussion before you received this check with anybody at Goodyear relative to this being the final amount due? A. No, not that I remember.

"Q. I call your attention to this endorsement printed on the back of the check. A. Yes.

"Q. 'Your endorsement hereon constitutes receipt in full for our voucher No. 95934, statement of which you have detached from this check', and ask you whether that is your signature immediately following? A. That's right, it is.

"Q. And will you tell me very briefly under what circumstances you signed that check, endorsed it? A. What do you mean, under what circumstances?

"Q. I mean, just tell me the details surrounding your signature on there. Were you at the bank, or where did that occur, do you remember? A. Well, I probably signed it at the bank where I cashed it, I don't remember.

"Q. Did you cash it soon after signing it? A. Well, it is hard for me to remember. Couldn't you tell on the date here? If it was made out April 21, and it was paid— when was it paid there? Can you read one of these?

"Mr. Holt: Paid May 1.

"Q. By Mr. Whyte: 5–1–44. At the time you endorsed your name on the back of the check, did you read this statement on the voucher, 'Final settlement of your share of profit resulting from operation of

Store 8377'? A. Oh, I probably read it. I don't remember what I read that long ago.

"Q. Did you appropriate the money that you derived from this check to your own use? A. Yes.

"Q. Did you ever make any objection to Goodyear after receiving this check either as to the terms of the instrument or the voucher or the amount of money paid you under this check? A. Well, I never—no, not until I filed this thing.

"Q. You haven't—have you ever offered to repay Goodyear any sum of money received by you in the form of your share of profit resulting from the Ventura store? A. No. Have I ever offered to pay Goodyear any?

"Q. Uh-huh. A. No."

In opposition to the motion for summary judgment plaintiff has filed an affidavit in which he alleges, so far as pertinent here, the following:

"That no complete statements of actual deliveries of merchandise by defendant upon orders secured by this affiant and said Ventura Store were delivered to affiant and this affiant did not know the true amount thereof, prior to the filing of defendant's answer herein. That affiant did, however, have access to records of orders submitted through said Ventura Store and knew that only a portion of the sales represented by said orders were credited to said Ventura Store and knew that only a portion thereof were included in the Profit and Loss sheets submitted to said Ventura Store.

"That affiant demanded frequently between September 19, 1942 and April 21, 1944 that defendant give him a full accounting of all sales of merchandise made to P. N. A. B. or the United States Navy Department at Port Hueneme but defendant at no time did so. That affiant also demanded an accounting of the business done at said Ventura store from time to time after affiants terminating the agreement for the operation thereof on September 24, 1943 but no complete accounting for the operation thereof was furnished by defendant until April 21, 194(5). As of April 21, 194(5) there were delivered to this affiant three documents which were: check number 95934 issued by defendant for One Thousand Three Hundred Sixty Dollars, Eighty-five Cents ($1360.85), a voucher bearing similar number and having thereon the typewritten words, 'Final settlement of your share of profit resulting from operation of store No. 8377', and a handwritten accounting statement purporting to be a profit and loss statement for said Ventura Store. Said statement showed amounts of profit resulting to said store but not the source thereof. No reference was made thereon to business done with P. N. A. B. or with Port Hueneme of the Navy Department.

4

"That before said April 21, 194(5) this affiant had frequently demanded that defendant account to him and the Ventura Store for commissions on business done with P. N. A. B. and for business at Port Hueneme and affiant had been informed by defendant's authorized representative that the Ventura Store would be credited with such of said business as might arbitrarily be allowed to the store by defendant and that if affiant wished to collect any more he would have to sue for it.

"That affiant believed that the check number 9-1934 and the voucher and accounting statement attached referred only to the amounts of business credited to said Ventura Store. That affiant did not believe that said check was offered in payment of any amounts of commission on said P. N. A. B. and Port Hueneme business not theretofore credited to said Ventura Store (which is hereafter referred to as disputed business) and did not believe that said voucher or said accounting statement in any manner referred to or affected said disputed business.

"That this affiant did not at any time intend to accept any amount in payment for said commissions on said disputed business and did not understand that said check or vouchers were in any manner intended as payment for such. That this affiant at all times intended to demand of defendant the amounts due for said disputed business and if necessary at all times intended to file suit to enforce said collection. That this affiant accepted said check in full payment of the accounts shown on the accounting statement attached but not of the disputed accounts which were not included therein.

"That affiant did not believe that any payment of said disputed accounts was offered to him and did not at any time intend to or believe that he was acknowledging receipt of any payment thereof."

In his memorandum of points and authorities filed in opposition to the motion for summary judgment, plaintiff's counsel concedes in effect that the facts set forth in the documents attached as exhibits to the answer, together with plaintiff's testimony as given in his deposition and the documents attached as exhibits thereto, are sufficient to establish prima facie the defense of accord and satisfaction. However, counsel contends that the matters alleged in plaintiff's affidavit sufficiently rebut such prima facie showing so as to raise issues of fact requiring a trial upon the merits. In this connection it is further claimed that plaintiff cannot be called upon to present his proof or additional facts until defendant has rested its case at a trial upon the merits.

In view of these contentions, we shall now proceed to consider the matters recited in plaintiff's affidavit. A reading thereof discloses that plaintiff admits that in September, 1942 a dispute arose between defendant and himself respecting the amount payable to him on account of the operation of the so-called Ventura store. He also concedes that disputes of a similar nature continued to arise from time to time thereafter. He asserts that between September 19, 1942 and April 21, 1944 he frequently demanded that defendant give him a full accounting of all sales of merchandise made to P. N. A. B. or the U. S. Navy Department at Port Hueneme, but defendant at no time did so. He further alleged therein: "That affiant also demanded an accounting of the business done at said Ventura store from time to time after affiant's terminating the agreement for the operation thereof on September 24, 1943 *but no complete accounting for the operation thereof was furnished by defendant until April 21, 194(5)* (1944) as of April 21, 1945 (1944) there were delivered to this affiant three documents which were: check number 95934 issued by defendant for One Thousand Three Hundred Sixty Dollars, Eighty-five Cents ($1360.85), a voucher bearing similar number and having thereon the typewritten words, 'Final settlement of your share of profit resulting from operation of store #8377; and handwritten accounting statement purporting to be a profit and loss statement for said Ventura Store. Said statement showed amounts of profit resulting to said store but not the source thereof. No reference was made thereon to business done with P. N. A. B. or with Port Hueneme of the Navy Department." (Emphasis added.)

In addition plaintiff asserts in said affidavit that he believed defendant's check number 95934 together with the attached voucher and accounting statement referred only to the amounts of business credited to said Ventura store; furthermore, that he did not believe or understand that these instruments referred to or affected the disputed business not theretofore credited to said store or that said check or voucher was offered in payment of commissions on such disputed business; that he did not intend to accept any amount in payment for said commissions on said disputed business; that he intended to demand of defendant the amounts due for said disputed business and if necessary to file suit to enforce collection; that he accepted said check in full payment of the accounts shown on the accounting statement but not of the disputed accounts not included therein; and finally, that he did not believe that any payment of said disputed accounts was offered to him, nor did he intend to acknowledge receipt of payment thereof or believe that he was so doing. Here it should be noted that copies of the aforementioned check, voucher and accounting statement are attached to defendant's answer and marked "Exhibit G".

Counsel for plaintiff has cited several cases which he insists support his contention to the effect that the matters set forth in the aforementioned affidavit present issues of fact requiring a trial upon the merits. The first of these citations is Newsom v. Woollacott, 5 Cal.App. 722, 91 P. 347. There suit was brought to recover the value of architectural services performed for defendant. The latter in his answer pleaded accord and satisfaction and inserted in his answer a copy of a check which he alleged was given to plaintiff as payment of his claim and which contained an endorsement thereon reading "In full for Ninth and Grand avenue fees." No affidavit denying the check was served or filed as provided in Section 448, *California Code of Civil Procedure.* At the trial defendant offered no evidence; the cause was submitted to a jury. The court instructed the jury in part as follows: "If you find that the check was intended to apply to the demand here sued upon, and that plaintiff accepted the check with words written thereon indicating that it was to be in full pay-

ment of all of such demands, and that he was aware of the presence of such words, then the check should be received by you as evidence of a complete settlement of such demand."

In another part of the charge the jury were told in effect that it was for them to find from .the evidence whether plaintiff had knowledge of the presence of the memorandum at the time of the delivery of the check to him, or knew of the writing upon such check before it passed out of his possession. In reversing· a verdict and judgment in favor of plaintiff the District Court of Appeal, Second District stated in the course of its opinion, 91 P. at page 348: "Having failed to file the affidavit of denial required by section 448 of the Code of Civil Procedure, respondent is deemed to have admitted the execution and genuineness of the instrument. Notwithstanding this admission, he may controvert the instrument by evidence of mistake, fraud, and like defenses, or show that it had no connection with the demand sued upon. Moore v. Copp. 119 Cal. 429, 51 P. 630. He offered no evidence touching the question, and, in the absence of any testimony, the instrument stands as an exponent of the facts therein set out, and its terms and legal effect are to be determined by an inspection of the instrument. Carpenter v. Shinners, supra [108 Cal. 359, 41 P. 473]. In the absence of any evidence to the contrary respondent is chargeable with what the instrument purports on its face to be, and it must be taken for just what it appears to mean. Petersen v. Taylor, 4 Cal. Unrep. Cas. 335, 34 P. 724; Brooks v. Johnson, 122 Cal. 569, 55 P. 423. Having failed to controvert it, respondent must be presumed to have had knowledge of the existence of the memorandum on the check at the time of the delivery thereof to him, and to have known of the writing thereon before it passed out of his possession. No proof of this fact was necessary. It was therefore error to instruct the jury, in effect, that, notwithstanding they found the check was intended to apply to the demand sued upon, they must nevertheless, in order to render a verdict for defendant, find the further fact that respondent was aware of the presence thereon of the words, 'In full for Ninth and Grand avenue fees,' and that respondent 'had knowledge of the presence of the memorandum written on the check at the time of its delivery to him,' or that 'he knew of the writing upon such

check before it passed out of his possession.' All that can be claimed for this check is that it constituted a receipt for money paid to respondent pursuant to the alleged settlement. As such, it is open to contradiction or explanation by parol testimony. In the absence of such contradiction or explanation, respondent is bound by what it purports on its face to mean." (Citing cases).

Another citation upon which plaintiff's counsel relies is that of Wallace v. Crawford, 21 Cal.App.2d 394, 69 P.2d 455. This was an action to recover the unpaid balance of 40% of the purchase price of a· rice crop. The trial court found that plaintiff sold to defendant a certain rice crop at a fixed price which was fully paid and rendered judgment against plaintiff. On appeal this judgment was affirmed. At the trial defendant claimed that plaintiff's acceptance and cashing of a check which was endorsed "Payment in full" constituted under the circumstances a stated account, which precluded the subsequent questioning of any of the items thereof, and that the cashing of that check under the circumstances also constituted an accord and satisfaction which estopped plaintiff from asserting he had not been paid in full for his entire claim. The trial court, however, failed to adopt findings, either upon the question of a stated account or with relation to an accord and satisfaction.

Plaintiff's counsel has quoted at considerable length from that portion of the court's opinion which deals with the point here involved. However, immediately following the language quoted by counsel the court there added the following, 69 P.2d at pages 461 and 462:

"In 1 California Jurisprudence, p. 134, § 10, it is said: 'The great weight of authority in American courts undoubtedly supports the rule that where the amount due is in dispute and a check for an amount less than that claimed is sent to the creditor with a statement that it is sent in full satisfaction of the claim, and the tender is accomplished by such acts or declarations as amount to a condition that if the check is accepted at all it is accepted in full satisfaction of the disputed claim, and the creditor so understands, its acceptance by the creditor constitutes an accord and satisfaction, even though the creditor states at the time that the amount tendered is not accepted in full satisfaction.'

"Since the court failed to adopt findings regarding the question of a stated account and with respect to the doctrine of accord and satisfaction, we shall not attempt to determine whether the conduct of the parties under all the circumstances of this case determines this action adversely to the appellant on those issues. We are of the opinion it is unnecessary to do so."

The remaining case cited by plaintiff upon the point under consideration is Kinkle v. Fruit Growers Supply Co., 63 Cal.App. 2d 102, 146 P.2d 8. There plaintiff brought suit on a contract for the balance due to him for cutting and hauling logs from defendant's land at an agreed price per thousand board feet together with damages resulting from forced delay in fulfillment of the contract. By its answer defendant admitted owing plaintiff the sum of $7,359.55. In the trial court a jury found that plaintiff was entitled to the additional sum of $6,777.30 on account of discrepancies in defendant's measurements of logs and also to damages in an additional amount. Besides other contentions made in the lower court, defendant claimed that the acceptance and cashing of checks by plaintiff given in payment for delivery of logs in accordance with accompanying reports constituted an accord and satisfaction, and also that failure to object to defendant's statements resulted in accounts stated barring plaintiff from disputing the measurements of logs contained therein.

With respect to each of the aforementioned decisions it must be kept in mind that in each instance a trial had been had on the merits. In other words, in none of the cases cited was the appellate tribunal called upon to review a ruling made upon a motion for summary judgment. Hence in none of these cases did the court undertake to define the rule prescribing the nature and extent of the counter-showing which plaintiff must present where otherwise defendant would be entitled to a summary judgment by virtue of a prima facie showing of accord and satisfaction.

Applying the views expounded by the court in Newsom v. Woollacott, 5 Cal. App. 722, 91 P. 347, it is clear that in the absence of any evidence the instruments set forth in defendant's answer and those attached as exhibits to plaintiff's deposition stand as exponents of the facts therein set out, likewise the terms and legal effect thereof are to be determined by an inspection of the same, also these must be taken for just what they appear to mean and plaintiff is chargeable with what these instruments purport on their face to be. In other words, in the absence of any evidence plaintiff must be presumed to have had knowledge of the contents of these documents, including the recital in the aforementioned voucher respecting final settlement and the corresponding endorsement on the accompanying check, at the time of the delivery thereof, and before the same passed out of his possession. Hence in the absence of evidence· of mistake, fraud or the like, or showing that said instruments had no connection with the demand sued upon, plaintiff must be held bound by what the same purport on their face to mean.

Similarly, applying the doctrine approved in Kinkle v. Fruit Growers Supply Co., 63 Cal.App.2d 102, 146 P.2d 8, 13, we must determine whether, in the light of the above mentioned instruments and plaintiff's admissions as disclosed in his deposition, the latter's affidavit presents sufficient evidence to warrant the Court finding that, although plaintiff received these instruments and cashed said check, also although he knew their contents and understood the meaning thereof, namely, that the same purported to be tendered by way of accord and satisfaction of his claim, and although he interposed no objection for a period of eight months after appropriating the proceeds of said check—such objection being merely the filing of the present lawsuit—nevertheless, plaintiff did not intend to, and in fact did not, accept such payment as full compensation of the amount he claimed to be due to him from defendant.

As previously noted, the record upon which defendant's motion for summary judgment has been submitted includes, in addition to the aforementioned instruments, plaintiff's testimony as set out in his deposition and his affidavit. The question therefore remaining to be determined is whether such testimony and affidavit, when appraised in conjunction with said instruments, leave any genuine issue or issues of fact still to be determined.

In Piantadosi v. Loew's Inc., 9 Cir., 137 F.2d 534, the Ninth Circuit Court of Appeals held that under the Federal rule relating to summary judgment mere denials, unaccompanied by any facts which would be admissible in evidence at a hearing, are insufficient to raise a genuine issue of fact. In the course of its opinion the Court there said, 137 F.2d at page 536: "Rule 56(e) of

the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, declares with respect to summary judgments that: 'Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' Under this rule mere denials, unaccompanied by any facts which would be admissible in evidence at a hearing, are not sufficient to raise a genuine issue of fact."

In Engl v. Aetna Life Ins. Co., 2 Cir., 139 F.2d 469, the Court held that in an action on life policies issued on the insured's representation that he had not consulted physicians, where physicians' depositions in support of the insured's motion for summary judgment showed that the insured had consulted physicians and submitted to examinations, but the nature of the ailment was not revealed because plaintiff claimed her statutory privilege relative to confidential communications made to a physician, summary judgment was properly granted on the ground that plaintiff thereby prevented full disclosure within the meaning of a New York statute creating the presumption that misrepresentations were material where plaintiff prevented disclosure as to the nature of the ailment.

In the case last cited, plaintiff contended that she was not compelled to disclose her case in advance of trial, and specifically that she was not required before that time to waive her privilege as to permitting the doctors to testify, and therefore could rely until then upon the possibility that the doctors might show the consultations to have been on inconsequential ailments.

Affirming the judgment of the trial court granting a motion for summary judgment, the Second Circuit Court of Appeals there declared, 139 F.2d at pages 472, 473:

"The federal summary judgment proceeding is the most extensive of any jurisdiction in that it is equally available to plaintiffs and defendants and in all forms and kinds of civil actions. But the history of the development of this procedure shows that it is intended to permit 'a party to pierce the allegations of fact in the pleadings and to obtain relief by summary judgment where facts set forth in detail in affidavits, depositions, and admissions on file show that there are no genuine issues of fact to be tried.' 3 Moore's Federal Practice 3175. In New York the question of constitutionality was settled by considering the procedure as one to determine whether a defense or issue formally stated between the parties was merely sham and not bona fide. Formerly this could be determined only on the face of the pleadings; the only essentially new step was to allow such a showing to be made on the basis of detailed affidavits. The rationale is well stated in one of the leading cases establishing constitutionality, Hanna v. Mitchell, 202 App.Div. 504, 518, 196 N.Y.S. 43, 55, affirmed 235 N.Y. 534, 139 N.E. 724; 'To say that a false denial, which defendants are unable to justify, must nevertheless put the plaintiff to his common-law proof before a jury, although the result would be a directed verdict in plaintiff's favor as a matter of law, is to exalt the shadow above the substance.' Hence we have often held that mere formal denials or general allegations which do not show the facts in detail and with precision are insufficient to prevent the award of summary judgment. (Citing cases).

"In the present case we have from the plaintiff not even a denial of the basic facts, but only in effect an assertion that at trial she may produce further evidence, which she is now holding back, to controvert the legal deduction from the New York statute and decisions that the conceded misrepresentations of the application are material. If one may thus reserve one's evidence when faced with a motion for summary judgment there would be little opportunity 'to pierce the allegations of fact in the pleadings' or to determine that the issues formally raised were in fact sham or otherwise unsubstantial. It is hard to see why a litigant could not then generally avail himself of this means of delaying presentation of his case until the trial. So easy a method of rendering useless the very valuable remedy of summary judgment is not suggested in any part of its history or in any one of the applicable decisions."

█ In Sartor v. Arkansas, N. G. Corpn., 5 Cir., 134 F.2d 433, the Court held that on a motion for summary judgment the parties should fully disclose what the evidence will be on issues raised by such motion, and if on such disclosures it appears that there is no disputed issue of fact the trial court should enter judgment in accordance with the showing made. Affirming a judgment granting a motion for a summary judgment, the Fifth Circuit

Court of Appeals there said, at pages 435, 436 of 134 F.2d: "We have written often on the nature and effect of Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, the rule for summary judgment. Our views, as there expressed, leave in no doubt that the summary judgment rule is a salutary one for the purpose of avoiding unnecessary trials, that is, trials where there is nothing of fact to be tried. They leave in no doubt too that *on such a motion it is the duty of counsel for plaintiff and defendant to fully disclose what the evidence will be on the issues raised by the motion, and of the district judge to proceed on the disclosures thus made.* If, on such disclosures, it appears that only one verdict could be rendered, that is, that there is no disputed issue of fact, it is then the duty of the judge to enter judgment in accordance with the showing made." (Emphasis added.)

██ Applying the foregoing decisions to the record before us, we find that in support of its motion for summary judgment defendant has set forth in detail documents, also excerpts from plaintiff's deposition and admissions which, unless challenged by contradictory evidence, establish that, prior to the commencement of this suit the claim herein sued upon had been settled by the parties through accord and satisfaction. Indeed this is not disputed. In his affidavit filed in opposition to the aforementioned proof plaintiff has admitted, in effect, that on April 21, 1944 (1945)—being the same time he received the aforementioned voucher and check bearing the endorsement that each was in full and final settlement of his claim—defendant also delivered to him an instrument purporting to be a complete accounting of the operation or business done at the so-called Ventura store. The balance of this affidavit, so far as pertinent here, consists of certain conclusions on the part of plaintiff and certain general statements expressing his belief and his intentions respecting said voucher and said check. Thus the record here presents the situation where the defendant in support of its motion for summary judgment has set forth in detail evidence which may be said "to pierce the allegations of fact in the pleadings" (of plaintiff) and where plaintiff has sought to oppose the motion with recitals in an affidavit which amount to nothing more than "mere formal denials or general allegations, which do not show the fact. in detail and with precision." Here

too plaintiff contends that at the trial he expects to "produce further evidence, which he is now holding back, to controvert the legal deduction", which otherwise must be drawn from the evidence submitted in support of defendant's motion, namely, that the claim sued upon has been settled by accord and satisfaction.

As pointed out in Engl v. Aetna Life Ins. Co., 2 Cir., 139 F.2d 469, 473, "If one may thus reserve one's evidence when faced with a motion for summary judgment there would be little opportunity 'to pierce the allegations of fact in the pleadings' or to determine that the issues formally raised were in fact sham or otherwise unsubstantial. It is hard to see why a litigant could not then generally avail himself of this means of delaying presentation of his case until the trial. So easy a method of rendering useless the very valuable remedy of summary judgment is not suggested in any part of its history or in any one of the applicable decisions."

Accordingly we conclude that defendant is entitled to judgment on its motion for summary judgment.